IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| MARK A. GEARY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1658 |
| | ) | Magistrate Judge Lisa P. Lenihan |
| | ) | |
| MICHAEL J. ASTRUE, | ) | Doc. Nos. 14, 16 |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |


## MEMORANDUM OPINION & ORDER

**LENIHAN, M.J.**

Currently before the Court for disposition are Plaintiff's Motion for Summary Judgment (Doc. No. 14) and Defendant's Motion for Summary Judgment (Doc. No. 16) in this Social Security appeal. For the reasons set forth below, the Court will deny the Plaintiff's Motion, grant the Defendant's, and affirm the decision of the Commissioner of Social Security to deny Plaintiff's application for benefits.


## I.    PROCEDURAL HISTORY

On December 14, 2006, Mark A. Geary ("Plaintiff"), by his counsel, timely filed a complaint pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), for review of the Commissioner's final determination disallowing his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. The history of Plaintiff's claim is as follows.

On March 21, 2001, Plaintiff filed his first applications for DIB and SSI payments alleging that he became disabled on January 2, 2001 due to back and neck injuries that allegedly resulted from a fall while self-employed. On September 14, 2001, the Social Security Administration denied his initial applications. On December 21, 2001, Plaintiff filed a new application for SSI payments and on January 8, 2002, he filed a concurrent application for DIB. These claims were again denied. Plaintiff filed a timely request for a hearing which was held on November 19, 2002. On March 25, 2003, the Administrative Law Judge (ALJ) issued an unfavorable decision. On May 9, 2003, Plaintiff filed a timely request for review of the ALJ's decision, which the Appeals Council denied on July 1, 2003. (R. 14.)

On August 23, 2004 and September 3, 2004, Plaintiff filed another set of applications for SSI and DIB, respectively. (R. 41-50.) On March 1, 2005, those claims were initially denied. (R. 29.) Plaintiff timely requested a hearing before an ALJ which was ultimately held on February 3, 2006 before ALJ Donald T. McDougall. (R. 34, 23.) On April 5, 2006, the ALJ denied Plaintiff's claim for benefits, concluding that although Plaintiff had severe impairments,[1] he retained the residual functional capacity to perform light, unskilled work, with certain restrictions, and that such work existed in significant numbers in the national economy. (R. 18-21.) Plaintiff filed a timely request for review of the ALJ's decision which the Appeals Council denied on August 4, 2006. (R. 6-8.) Plaintiff then filed the present action in this Court.

On appeal to this Court, Plaintiff raises one issue, asserting that the ALJ's decision is not supported by substantial evidence at Step 5 because it is based on a defective hypothetical question

---

1. The ALJ determined that Plaintiff suffered from the following severe impairments: vertebrogenic disorder, degenerative joint disease of the left knee, and an adjustment disorder/depression. (R. 17.)

that failed to incorporate all of Plaintiff's work-related impairments. In particular, Plaintiff submits that the ALJ failed to include the non-exertional limitation of moderate deficits in his ability to maintain concentration, persistence and pace, which Plaintiff claims is supported by the medical evidence. (Pl.'s Br. in Supp. of Summ. J. at 5.) For the reasons set forth below, the Court finds no merit to Plaintiff's argument.

## II.  STATEMENT OF FACTS

Plaintiff was born on May 25, 1959 and was thus 46 as of the date of his administrative hearing. He has a high school education, followed by four years in the United States Air Force during which he worked and received training as a sheet metal fabricator. (R. 223.) After being honorably discharged from the U.S. Air Force in 1985, Plaintiff worked several different jobs, including a sheet metal fabricator, glass plate technician, and car detailer, until January 2, 2001. (R. 62-63, 85.)  From 1994 to 2001, Plaintiff worked intermittently, and in most of those years, his earnings fell below the SGA level.  (R. 53-59.)  Plaintiff had no income in 2001 through 2005.  (R. 59.)

Plaintiff alleges that his disability began on March 26, 2003 (R. 28, 42, 62 & 69),[2] and that it resulted from back and neck injuries sustained in a fall on January 2, 2001, while lifting a garage door (R. 223). The medical records show that on February 23, 2001, Plaintiff saw an orthopedic

---

2.  The ALJ found that Plaintiff's alleged onset date was January 1, 2001.  (R. 14.)  Plaintiff testified at the hearing on February 3, 2006, that he has been disabled since January 1, 2001. (R. 223.)  The ALJ has apparently inadvertently used the 2001 date as the alleged onset date. However, SSA previously denied an earlier claim for DIB based on that AOD.  Moreover, the Disability Claim form (R. 42), Disability Report–Adult (R. 62), Disability Report–Field Office (R. 69), as well as the Disability Determination & Transmittal form dated February 28, 2005 (R. 28), list the alleged onset date as March 26, 2003.  Interestingly, the March 26th date is one day after the ALJ's decision denying his earlier claim for benefits.  (R. 14.)  In any event, the actual AOD is not at issue in this case.

surgeon, W. Timothy Ward, M.D., about severe left leg pain. (R. 112.) An MRI revealed a ruptured disc and foraminal stenosis at the left side at L5-S1. (Id.) The MRI also revealed a large ruptured disc at C6-7, but he had no evidence of radiculopathy or myelopathy at that time. (Id.) At the recommendation of Dr. Ward, Plaintiff underwent an L5 laminectomy and foraminotomy on March 14, 2001 to relieve his ruptured disc and foraminal stenosis. (R. 110.) In addition, the records of Dr. Ward and Plaintiff's primary care physician, J. Miller Oppy, M.D., demonstrate that Plaintiff received prescriptions for strong pain medications from April until July of 2001.[3]

Following surgery, on April 27, 2001, Plaintiff complained to Dr. Ward of bilateral arm numbness and clumsiness to his gait. (R. 109.) After reviewing a new MRI showing a very large ruptured disc, Dr. Ward planned another surgery, a C6 corpectomy, for May 9, 2001. (Id.) Following surgery, Dr. Ward noted on May 25, 2001 Plaintiff's chronic complaints of neck pain, but that he no longer experienced numbness in his arms and legs and was walking much better. (R. 108.) On June 29, 2001, Plaintiff reported to Dr. Ward that he was "doing beautifully" recovering from his C6 corpectomy. (R. 107.) Dr. Ward noted Plaintiff's gait had improved and his previous numbness and pain in his arms had completely subsided. (Id.) At that time, Dr. Ward also noted that Plaintiff reported severe right thigh pain, "of new onset" and sent Plaintiff for an MRI of his lumbar spine to ensure the health of his lumbar roots. (Id.) On July 13, 2001, Plaintiff denied his previous pain in his right thigh, but complained that he suffered from severe pain radiating from his left buttock

---

3. Plaintiff was prescribed narcotics on several occasions for his pain. Post surgery, Dr. Ward prescribed 40 tablets of OxyContin and 50 tablets of Oxy IR on April 6, 2001 (R. 111); Dr. Ward prescribed 50 tablets of OxyContin on May 25, 2001, but noted that in six weeks, he was going to back off the narcotics and may refer Plaintiff to the Pain Clinic (R. 108); Dr. Oppy prescribed 45 tablets of Flexeril on June 19, 2001 (R. 147) and 15 tablets of Percocet on June 26, 2001 (R. 148). On February 28, 2002, Dr. Oppy's records indicate that Plaintiff is taking 20 mg of OxyContin two times a day. (R. 144.)

to his left leg. (R. 106.) Dr. Ward's neurological exam of his lower extremities was unremarkable. (Id.) Dr. Ward noted it was unclear what bothered Plaintiff, and prescribed him 75 tablets of Vicodin for pain, noting that if Plaintiff did not improve in four weeks or so, he may have to undergo additional exploratory surgery at the L5-S1 disc. (Id.)

Between July of 2001 and August of 2004, Plaintiff saw Dr. Oppy on several occasions for unrelated illnesses/conditions, and during that time, the office notes contain only one reference to complaints of, or treatment for, back pain. (R. 131.) On May 6, 2002, Dr. Oppy's notes reveal that while seeking treatment for dermatitis, Plaintiff inquired about Vioxx for chronic back pain and the possibility of physical therapy. (R. 141.) Dr. Oppy noted that his back pain was currently not too bad, but he gets occasional flare-ups of pain. (Id.) Dr. Oppy provided Plaintiff with samples of Vioxx and instructed him to contact the office when he experienced another flare up of back pain, and physical therapy would be initiated at that time. (Id.)

Two years later, on May 4, 2004, Plaintiff saw Dr. Oppy, complaining of pain and numbness in his left hip and foot, for which Dr. Oppy ordered an MRI. (R. 131.) Dr. Oppy noted Plaintiff was taking Percocet and Ibuprofen for the pain. (Id.) On June 15, 2004, Dr. Oppy reviewed the result of the MRI, which showed that Plaintiff suffered from mild spinal stenosis at L2-4. (R. 132.) Dr. Oppy gave Plaintiff a sample prescription of Vioxx and discontinued his Ibuprofen. (Id.) He also prescribed physical therapy, three days a week for four weeks. (Id.) On June 29, 2004, Plaintiff reported to Dr. Oppy that physical therapy was going well, although he was still tight at night time. (Id.) At a follow-up appointment for Plaintiff's back pain on July 13, 2004, Plaintiff related that his pain was not improving after having completed physical therapy, and Dr. Oppy referred him to a neurosurgeon and continued Plaintiff on Vioxx and Ibuprofen. (R. 129.)

On August 6, 2004, Plaintiff saw Dr. Ward for new onset of left leg pain. (R. 126.) Dr. Ward ordered a new MRI and directed Plaintiff to return for follow-up visit with the results of the MRI. (Id.) On August 20, 2004, Dr. Ward saw Plaintiff in follow-up for his recurrent left leg pain and reviewed his recent MRI, which showed significant foraminal changes on the left at L5-S1 and a significant degenerative disc at that level. (R. 125.) On September 8, 2004, Plaintiff underwent L5-S1 laminectomy and fusion and was discharged on September 10, 2004 in good condition with Percocet and Flexeril for pain. (R. 122-23.)

On September 24, 2004, Dr. Ward saw Plaintiff for follow up examination post-surgery. (R. 124.) Dr. Ward reported that Plaintiff's left leg pain was gone and encouraged Plaintiff to walk as much as possible, but to avoid bending and twisting. (Id.) On that date, Dr. Ward also noted anterior right thigh pain resulting from pressure on Plaintiff's cutaneous nerve during surgery. (Id.) Dr. Ward explained to Plaintiff this pain would go away over time. (Id.) Dr. Ward prescribed Plaintiff 60 tablets of Vicodin. (Id.)

On October 7, 2004, Plaintiff saw Dr. Oppy with a complaint of pain in his right thigh since the back surgery. (R. 128.) Plaintiff reported that his back was doing much better, but that right thigh pain persisted. (Id.) Dr. Oppy recommended Plaintiff apply moist heat or ice to his thigh and replaced Vioxx with Bextra, and referred Plaintiff for nerve conduction study (NCS) in both legs. (Id.) On October 20, 2004, Frank B. Artuso, M.D. reported the results of the NCS. (R. 149-150.) Dr. Artuso found right anterior lateral femoral neuropathy. (R. 149.)

Plaintiff began weekly out-patient psychotherapy treatment with Family Behavioral Resources on September 22, 2004 for depression. (R. 169-177.)    At his initial interview on September 22nd, the therapist noted on the intake form that Plaintiff suffered from acute pain and

fatigue (R. 169), and indicated Plaintiff was experiencing numerous symptoms, including: angry outbursts, attention problems (due to pain), anxiety, relationship difficulties, depression/sad mood, hopelessness, energy level change, low self esteem, and mood swings (due to pain and financial situation). (R. 169, 171.) The therapist also conducted a Mental Status Examination ("MSE"), which showed that Plaintiff was well-oriented times three, he displayed average overall short-term and long-term memory, his overall level of insight and judgment was average, and in the area of memory and concentration, Plaintiff was able to count backwards in series of 7's.[4] (R. 176.) The therapist noted that his mood was depressed and he had a flat affect. (Id.) The MSE showed his thought process and speech were normal. (R. 177.) The therapist recommended weekly, one-hour, individual therapy sessions, to continue until his mood was elevated and his overall feeling was less depressed. (Id.) Plaintiff continued his individual psychotherapy at Family Behavioral Resources until approximately November 18, 2004. (R. 158-64.)

In addition, on October 15, 2004, at the recommendation of his attorney, Plaintiff underwent a psychiatric evaluation with psychiatrist, Leyla Somen, M.D. (R. 165-167.) Dr. Somen reported that Plaintiff stated he was able to attend to his activities of daily living and used a cane to get around. (R. 165.) Plaintiff further stated he socialized with a few friends, but did not go out due to financial constraints. (Id.) Dr. Somen's MSE revealed that Plaintiff was fully cooperative, with good eye contact, was alert, well-oriented, had intact social judgment, good insight and a good fund of common knowledge. (R. 166-67.) The MSE further showed that Plaintiff denied hallucinations,

---

4. According to the SSA regulations, one method of assessing a claimant's concentration during the MSE is to have the claimant subtract serial sevens or serial threes from 100. See Listing 12.00C.3., 20 C.F.R. Pt. 404, Subpt. P, App. 1 (4-1-08). This is commonly referred to as "serial 7's." Other methods of assessing a claimant's level of functioning as to concentration include psychological tests of intelligence or memory and work evaluations. (Id.) The record does not contain any psychological test results or work evaluations.

suicidal ideation, and crying spells. (R. 167.) As to concentration, the MSE showed that Plaintiff

was able to do serial 7's. (Id.) Plaintiff stated that he worried a lot but did not feel depressed. (Id.)

Dr. Somen diagnosed Plaintiff with adjustment disorder and assessed a global assessment of

functioning (GAF) of 50-60.[5] (R.167.) Dr. Somen recommended that Plaintiff continue individual

treatment at Family Behavioral Resources, continue taking his pain medications, prescribed

Benedryl for his difficulty sleeping, and discontinued all other medication. (Id.)

Sometime after Dr. Somen's psychiatric evaluation of Plaintiff, Edward Jonas, Ph. D., a state

agency psychologist consultant, reviewed the record for the purpose of determining the severity of

Plaintiff's mental impairment and the degree of functional limitation caused by the mental

impairment, by completing the Psychiatric Review Technique Form ("PRTF").[6] In the PRTF, Dr.

Jonas rated Plaintiff's degree of limitation as "moderate" in the area of difficulties in maintaining

social functioning, and in maintaining concentration, persistence, or pace, but found no degree of

limitation in activities of daily living ("ADLs") and repeated episodes of decompensation. (R. 195.)

Dr. Jonas also completed a Mental Residual Functional Capacity Assessment ("Mental RFC"),

wherein he ultimately concluded that Plaintiff had the functional capacity to perform "the basic

_____

5. 60-51 describes "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." 50-41 describes "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR 34 (4th ed. 2000).

6. The PRTF is applied at Step 3 to determine whether a claimant's mental impairment(s) either meet, or are equivalent in severity to, the criteria of a listed mental disorder. Listing 12.00A, 20 C.F.R. Part 404, Subpt. P, App. 1; 20 C.F.R. §§ 404.1520a(e) & 416.1520a(e). With regard to Listing 12.04, under the B criteria, the consultant rates the degree of the claimant's functional limitations in four broad categories based on the extent to which his mental impairment(s) interfere with his ability to function independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. §§ 404.1520a(c) & 416.920a(c); See also Form SSA-2506-BK (PRTF) at 11.

mental demands of competitive work on a sustained basis, despite the limitations resulting from his mental impairment." (R. 200.) In the individual functional categories, Dr. Jonas assessed Plaintiff as moderately limited in his ability to maintain attention and concentration for extended periods; (2) to work in coordination with or proximate to others without being distracted by them; (3) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 198-199.) Dr. Jonas also assessed Plaintiff as moderately limited with respect to his ability to interact appropriately with public and to accept instructions and respond appropriately to criticism by supervisors, his ability to adapt appropriately to changes in the work place, and his ability to travel in unfamiliar places or use public transportation. (R. 199.) In all other material respects, Dr. Jonas found either no evidence of limitation or rated Plaintiff as not significantly limited. (R. 198-199.) In reaching his conclusion, Dr. Jonas considered the medical report of Plaintiff's examining psychiatrist, Dr. Somen, and stated that he gave it appropriate weight. (R. 200.)

On December 30, 2004, Plaintiff consulted a neurologist, Michael K. Sauter, M.D., for his back pain and right thigh numbness based on Dr. Oppy's recommendation. (R. 208.) Dr. Sauter ordered a series of tests to determine the cause of his neuropathy and gait impairment. (R. 181.) The results of these tests showed abnormal lower extremity somato-sensory evoked potential with slight attenuation on left sides, and the upper extremity showed an abnormal evoked potential with attenuation of the erbs point signal on the right suggestive of radicular syndrome. (R. 184.) During a follow-up visit on February 22, 2005, Dr. Sauter noted Plaintiff suffered from focal neuropathy affecting his lateral femoral cutaneous nerve on the right side and ongoing lumbar spondylosis. (R. 208.) He prescribed Neurontin and referred Plaintiff to a pain clinic for trigger point injections. (Id.)

Beginning in January 2005, Plaintiff began physical therapy for his lower back pain; the record includes notes from six sessions of physical therapy at Highlands Hospital during January of 2005. (R. 181-183.)

Upon Dr. Sauter's referral, Plaintiff consulted with pain management specialist, Brinda Navaglund, M.D., on March 7, 2005. (R. 202-205.) Dr. Navaglund noted that Plaintiff stated the Neurontin did not provide any relief to him and that he continued to experience right anterior thigh, lumbar, back, and neck pain. (R. 202.) Dr. Navaglund further noted lumbar spine tenderness and decreased sensation of the right thigh. (R. 204.) In light of the continued pain, Dr. Navaglund recommended a lateral femoral cutaneous nerve block and a caudal injection to help him with his low back pain. (R. 205.) However, the record does not indicate whether Plaintiff underwent this treatment.

On April 1, 2005, Plaintiff had follow-up examination with Dr. Oppy for increased back pain and headaches over the preceding month. (R. 209.) Plaintiff reported that he had stopped taking Neurontin because it made him feel "spaced out."(Id.) Dr. Oppy recommended another trial of Neurontin, this time slowly increasing the dosage. (Id.) He also recommended that Plaintiff undergo an MRI, which ultimately occurred on May 14, 2005. (Id.) The MRI revealed right-sided and left-sided disc herniations in the thoracic region, each causing slight compression, mild disc dessication, and Schmorl's node formation. (R. 206.)

The record further reveals that Plaintiff returned to see Dr. Artuso on April 19, 2005 for an EMG/NCS, which revealed a mild abnormality in the right C4 nerve distribution, suggesting possible right C4 radiculopathy. (R. 211-15.) In addition to his back problems, the record shows that Plaintiff suffered from degeneration and tears in his medial meniscus and anterior cruciate

ligament, as determined by an MRI of Plaintiff's left knee on February 14, 2006. (R. 216.)

Plaintiff, represented by counsel, appeared and testified at his hearing in Morgantown, West Virginia on February 3, 2006. There Plaintiff stated he was currently taking Ibuprofen 800 m.g. three times a day for pain, and that he had no side effects from the medication. (R. 224.) He further stated that he did not have any ongoing problems with his neck. (R. 226.) Plaintiff indicated, however, that pain sometimes affected his concentration, stating that he had good days and bad days. (R. 238.) Plaintiff testified that on a good day, he could walk approximately one-quarter mile (R. 224), could stand 10 to 15 minutes at a stretch without overdoing it, could sit 30 to 60 minutes, but needed to get up and move every 30 to 45 minutes to loosen up (R. 225). Plaintiff further testified that he spent most of his time watching television, taking short walks around the yard to loosen up, and reading the local newspaper. (R. 227, 229.) Plaintiff admitted that he has never looked for a job in the last three to four years. (R. 230.)

James Ganoe, an impartial vocational expert, also appeared at the hearing and testified. The ALJ posed the following hypothetical question to the vocational expert:

> If we assume a person of the same age, education and work experience as the claimant, assume a person who's able to do light work as that's defined in the Commissioner's regulations, but assume the person, in addition, must have to be able to change positions briefly, and by briefly, I mean, just a minute or two at least every half-hour, no climbing ladders, ropes, scaffolds, stairs or ramps, no more than occasional balance, stoop, kneel, crouch or crawl, no exposure to temperature extremes and no exposure to extreme humidity or wetness. Would there be any jobs such a person could do, any unskilled light or sedentary jobs that such a person could do? Oh, and let me just add one other thing, no bending at the waist more than 45 degrees.

(R. 245-46.) The vocational expert responded that under the light exertional level, a toll collector and mail clerk met those criteria and existed in substantial numbers in the national and regional

economies. (R. 246.) The ALJ further inquired as to the availability of sedentary jobs under the hypothetical. (<u>Id</u>.) The vocational expert responded that a general sorter and addresser/stuffer are sedentary jobs that existed in substantial numbers in the national and regional economies. (<u>Id</u>.)

## III.  **"SUBSTANTIAL EVIDENCE" STANDARD OF REVIEW**

In reviewing an administrative determination of the Commissioner, the question before any court is whether there is substantial evidence in the agency record to support the findings of the Commissioner that the plaintiff failed to sustain his burden of demonstrating that he was disabled within the meaning of the Social Security Act. 42 U.S.C. § 405(g).   <u>See also</u>, <u>e.g.</u>, <u>Richardson v. Perales</u>, 402 U.S. 389 (1971); <u>Adorno v.  Shalala</u>,  40  F.3d 43  (3d Cir. 1994).

 More specifically, 42 U.S.C. Section 405(g) provides:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1000) (citing <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)); <u>Plummer v. Apfel</u>, 186 F.3d 422 (3d Cir. 1999). Although there may be contradictory evidence in the record, it is not cause for remand or reversal of the Commissioner's decision if substantial support exists.  <u>Sykes v. Apfel</u>, 228 F.3d 259, 262 (3d Cir. 2000).

The Third Circuit has noted that evidence is not substantial "if it is overwhelmed by other evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion."  <u>Kent v. Schweiker</u>, 710 F.2d 110, 114 (3d Cir.

1983); see also Gilliland v. Heckler, 786 F.2d 178, 183 (3d Cir. 1986). In addition, despite the deference due to administrative decisions in disability benefit cases, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981). Finally, the "grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." Fargnoli v. Massanari, 247 F.3d 34, 44 n. 7 (3d Cir. 2001) (quoting SEC v. Chenery, 318 U.S. 80, 87 (1943)).

## IV. DISABILITY EVALUATION

The issue before the Court for immediate resolution is a determination of whether there is substantial evidence to support the finding of the Commissioner that Plaintiff was not disabled within the meaning of the Act, but had the residual functional capacity to perform a form of substantial gainful employment.

The term "disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

The requirements for a disability determination are provided in 42 U.S.C. § 423(d)(2)(A):

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence . . . 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions

13

of the country.

A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).[7]

Finally, the applicable regulations set forth a more explicit five-step evaluation to determine disability. The regulations, published at 20 C.F.R. §§404.1501-1529, set forth an orderly and logical sequential process for evaluating all disability claims.[8] In this sequence, the ALJ must first decide whether the plaintiff is engaging in substantial gainful activity. If not, then the severity of the plaintiff's impairment must be considered. If the impairment is severe, then it must be determined whether it meets or equals the "Listings of Impairments" in Appendix 1 of the Regulations which the Commissioner has deemed of sufficient severity to establish disability. If the impairment does

---

7. In reviewing a disability claim, the Commissioner must consider subjective symptoms as well as the medical and vocational evidence. See Green v. Schweiker, 749 F.2d 1066, 1068 (3d Cir. 1984) (explaining that "subjective complaints of pain [should] be seriously considered, even where not fully confirmed by objective medical evidence"); Bittel v. Richardson, 441 F.2d 1193, 1195 (3d Cir. 1971) ("Symptoms which are real to the claimant, although unaccompanied by objective medical data, may support a claim for disability benefits, providing, of course, the claimant satisfies the requisite burden of proof.").

In assessing a plaintiff's subjective complaints, the ALJ may properly consider them in light of the other evidence of record, including objective medical evidence, plaintiff's other testimony, and plaintiff's description of his daily activities. See Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). And so long as a plaintiff's subjective complaints have been properly addressed, the ALJ's decisions in that regard are subject only to the substantial evidence review discussed in Section C, *supra*. See Good v. Weinberger, 389 F. Supp. 350, 353 (W.D. Pa. 1975) (discussing Bittel and concluding that where "plaintiff did not satisfy the fact finder in this regard, so long as proper criteria were used, [it] is not for us to question"); see also Kephart v. Richardson, 505 F.2d 1085, 1089 (3d Cir. 1976) (noting that credibility determinations of ALJ are entitled to deference).

8. This evaluation process has been repeatedly reiterated with approval by the United States Supreme Court. See, *e.g.*, Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003).

not meet or equal the Listings, then it must be ascertained whether the plaintiff can do his past relevant work. If not, then the residual functional capacity ("RFC") of the plaintiff must be ascertained, considering all of the relevant evidence in the file, to assess whether the plaintiff has the ability to perform other work existing in the national economy in light of plaintiff's age, education and past work experience.[9]

Plaintiff bears the burden of proof at Steps 1 through 4. Thus, once the ALJ finds that the plaintiff is unable to perform his past relevant work, as in the present case, the burden then shifts to the Commissioner to show that other work exists in significant numbers in the national economy that accommodates his residual functional capacity. *See* 20 CFR § 404.1520; Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984).[10] Thus, it must be determined whether or not there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff was not disabled within the meaning of the Social Security Act.

## V.    ANALYSIS

Plaintiff alleges that the ALJ's hypothetical was "inaccurate" as a matter of law because it failed to incorporate Plaintiff's "non-exertional limitation of moderate deficits in his ability to

---

9. The finding of residual functional capacity is the key to the remainder of findings under the regulations. If the plaintiff's impairment is exertional only, (*i.e.,* one which limits the strength he can exert in engaging in work activity), and if his impairment enables him to do sustained work of a sedentary, light or medium nature, and the findings of age, education and work experience made by the ALJ coincide precisely with one of the rules set forth in Appendix 2 to the regulations, an appropriate finding is made. If the facts of the specific case do not coincide with the parameters of one of the rules, or if the plaintiff has mixed exertional and non-exertional impairments, then the rules in Appendix 2 are used as guidelines in assisting the ALJ to properly weigh all relevant medical and vocational facts. *See* 20 C.F.R. § 404.1569; Appendix 2 to Subpart P of Part 404, Title 20, § 200.00(a).

10. The Commissioner may establish that jobs for a particular claimant exist in the national economy in several ways, including by way of the testimony of a vocational expert. See Jesurum v. Sec'y of the U.S. Dep't of Health & Human Serv., 48 F.3d 114, 119 (3d Cir. 1995).

maintain concentration, persistence and pace." (Pl.'s Br. in Supp. of Summ. J. at 5.)  Plaintiff

submits that this limitation is supported by the record evidence, in particular, his chronic pain as

documented by surgeries in 2001 and 2004, and the treatment notes of Doctors Oppy and Sauter and

pain specialist, Dr. Navalgund.  In addition, Plaintiff points to the records regarding his mental

health treatment for adjustment disorder.  Plaintiff thus maintains that the evidence of record is

replete with reference to his significant pain and the reasonable outcome of decreased concentration.

Based on <u>Burns v. Barnhart</u>, 312 F.3d 113 (3d Cir. 2002), Plaintiff contends that the ALJ's failure

to include this non-exertional limitation in the hypothetical was legal error and therefore, the ALJ's

decision is not supported by substantial evidence.

In response, the Commissioner argues that "the ALJ properly accounted for Plaintiff's

concentration difficulties by limiting him to unskilled work." (Def.'s Br. in Supp. of Summ. J. at 9.)

In support, the Commissioner relies on the definition of unskilled work set fourth in the

regulations,[11] and Social Security Ruling 85-15, which describes the basic demands of competitive

remunerative unskilled work.[12]  Based on the evidence of record, in particular the opinion of Dr.

Somen and Dr. Jonas' report, the Commissioner argues that the ALJ reasonably concluded that

---

11.  In the regulations, "unskilled work" " is defined as "work which needs little or no judgment
to do simple duties that can be learned on the job in a short period of time. The job may or may
not require considerable strength. For example, we consider jobs unskilled if the primary work
duties are handling, feeding and offbearing (that is, placing or removing materials from machines
which are automatic or operated by others), or machine tending, and a person can usually learn
to do the job in 30 days, and little specific vocational preparation and judgment are needed. A
person does not gain work skills by doing unskilled jobs." 20 C.F.R. §§ 404.1568(a), 416.968(a).

12.  SSR 85-15 provides in relevant part: "The basic mental demands of competitive,
remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out,
and remember simple instructions; to respond appropriately to supervision, coworkers, and usual
work situations; and to deal with changes in a routine work setting." S.S.R. 85-15, 1985 WL
56857 at *4 (1985).

Plaintiff's concentration difficulties would not preclude the modest demands of unskilled work. Therefore, according to the Commissioner, the ALJ's decision is supported by substantial evidence.

In reply, the Plaintiff takes issue with the Commissioner's reliance on the definition of unskilled work in the regulations, arguing that the regulations refer only to how long it takes to learn an unskilled job and that little judgment is needed to perform it. Plaintiff further submits that the definition does not take into consideration or address the level of concentration and task persistence necessary to perform unskilled work. According to Plaintiff, the ALJ's failure to question the vocational expert about the level of concentration and task persistence needed to perform unskilled work requires this Court to conclude that the ALJ's decision is not supported by substantial evidence.

In order for the Court to find that a hypothetical question was based on substantial evidence, the "hypothetical question must reflect all of a claimant's impairments *that are supported by the record.*" Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (citing Podedworny v. Harris, 745 F.2d 210 (3d Cir. 1984); Wallace v. Secretary, 722 F.2d 1150 (3d Cir. 1983)) (emphasis added); Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir. 2004) (citing Chrupcala, supra; other citations omitted). In Burns v. Barnhart, the Court of Appeals, in discussing hypothetical questions posed to vocational experts, explained: "'[w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments.'" 312 F.3d 113, 123 (3d Cir. 2002) (quoting Podedworny, 745 F.2d at 218). Stated another way, where medically undisputed evidence of specific impairments exists in the record and such impairments are not included in the

hypothetical, the vocational expert's response is not considered substantial evidence at Step Five. Id. (citing Podedworny, supra (citing Wallace, 722 F.2d at 1155)).

The Court of Appeals noted, however, in Ramirez, that if the ALJ's omission of a certain limitation from the hypothetical could be explained by the evidence of record,[13] then the hypothetical would be legally sufficient, and thus, the ALJ's decision would be supported by substantial evidence. 372 F.3d at 555. Recently in Johnson v. Comm'r, the Court of Appeals applied this same reasoning when it held that a limitation asserted by the claimant regarding fine manipulation did not accurately portray her medical impairment, as such a limitation was not supported by the medical evidence, and therefore, the ALJ was not required to incorporate it into the hypothetical question. Johnson v. Comm'r, 529 F.3d 198, 206 (3d Cir. 2008). In so holding, the Court of Appeals observed:

> "We do not require an ALJ to submit to the vocational expert every impairment *alleged* by a claimant." Rather, "the hypotheticals posed must 'accurately portray' the claimant's impairments and [ ] the expert must be given an opportunity to evaluate those impairments 'as contained in the record.'"

Id. (quoting Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (citation omitted)). For the reasons that follow, the Court finds in the present case, that the ALJ included all of the limitations supported by the evidence of record, and therefore, the hypothetical question was not legally deficient.

---

13. For example, in Ramirez, the Court of Appeals found a valid reason for omitting a specific limitation might exist where the ALJ concluded from the record that the deficiencies in concentration, persistence and pace were so minimal or negligible that they would not limit the claimant's ability to perform simple tasks under a production quota. 372 F.3d at 555. In Ramirez, the Court of Appeals found that the record did not provide a valid reason for the omission, and therefore, found the hypothetical deficient in its lack of specificity regarding the claimant's mental limitations. Id.

A review of the record here reveals that the ALJ duly considered all of the relevant evidence and reasonably concluded that Plaintiff was not disabled. In his decision, the ALJ found that Plaintiff suffered from medically determinable physical impairments that could reasonably be expected to produce the alleged pain complained of by Plaintiff. However, the ALJ found Plaintiff's statements regarding the intensity, duration and limiting effects of his pain were not fully credible. The ALJ adequately explained why he did not give full credit to Plaintiff's complaints of pain, which the Court finds is supported by the record. For example, other than narcotic pain medications prescribed for short periods of time surrounding his surgeries, Plaintiff has taken mainly Ibuprofen for chronic pain. The record further shows that his back and neck conditions significantly improved after each surgery, yet Plaintiff has never attempted to look for work since approximately 2002. In addition, a review of his earnings records reveals mostly intermittent earnings from 1994 through 2000, and in every year but one (1997) since 1994, his earnings fell below the SGA level. Also, except for one occasion in 2002, there is a thirty-three month period from July 2001 to May 2004 where the treatment notes do not reflect any complaints of back or neck pain.[14] Moreover, none of Plaintiff's treating physicians opined that he was unable to return to work. Given the deferential standard of review on appeal, this Court concludes that the ALJ's finding that Plaintiff's complaints of pain were not fully credible was reasonable and supported by substantial evidence.

Because the ALJ reasonably determined that Plaintiff's complaints of pain were not fully credible, the ALJ was justified in omitting a limitation from the hypothetical regarding difficulties with concentration, persistence and pace attributable to his of allegations of chronic pain. Chupcala,

---

14. In addition, although the results of the April 2005 EMG/NCS showed a mild abnormality, and the May 2005 MRI showed disc herniation, there is no evidence in the record that Plaintiff sought any further treatment for his back condition from May 2005 up through the date of the hearing.

829 F.2d at 1276; <u>Ramirez</u>, 372 F.3d at 555; <u>Johnson</u>, 529 F.3d at 206.

That does not end the inquiry, however, as Plaintiff also contends that his treatment for his mental impairment, adjustment disorder, supports the inclusion of a limitation in the hypothetical for decreased concentration, persistence and pace. After reviewing the record, the Court concludes that a specific limitation as to Plaintiff's ability to concentrate and keep pace does not accurately reflect his mental impairment, and therefore, the ALJ did not err as a matter of law in failing to include it in the hypothetical.

In determining at Step 3 that Plaintiff's mental impairment did not meet or equal the "B" criteria of Listing 12.04, the ALJ found that Plaintiff's mental impairment resulted in "no more than a mild restriction of ADLs, mild difficulty in maintaining social functioning; no more than moderate difficulty in maintaining concentration, persistence or pace; and no repeated episodes of decompensation." (R. 17-18.) Plaintiff contends that based on this finding, the ALJ was required to include a restriction in the hypothetical as to concentration, persistence and pace. However, the ALJ's finding at Step 3 is not necessarily determinative of Plaintiff's residual functional capacity at Steps 4 and 5. Indeed, the SSA cautions that:

> The [ALJ] must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

S.S.R. 96-8p, 1996 WL 374184, *4 (July 2, 1996). Moreover, this more detailed assessment must be based on all of the relevant evidence. <u>Id</u>. at * 5.

Here at Steps 4 and 5, the ALJ considered all of the relevant evidence in arriving at Plaintiff's residual functional capacity, which did not include any restrictions as to concentration or pace. In so doing, the ALJ explained that he rejected, as too restrictive, Dr. Jonas' "moderately limited" rating[15] in the Mental RFC as to maintaining social functioning and concentration, persistence and pace, in light of the minimal medical evidence, which consisted of weekly outpatient psychotherapy of less than two months' duration; Plaintiff had no hospitalizations for his mental impairment and received no psychotropic medications. The ALJ further explained that he gave controlling weight to the opinion of Dr. Somen, a treating medical source, which the ALJ found "would very likely allow [light, unskilled] work as described in the residual functional capacity assigned to the claimant." (R. 20.) The Court notes that Dr. Somen's observations and MSE results are consistent with that of the therapist who conducted the initial interview three weeks earlier. Plaintiff fails to point to any contrary evidence in the record from a treating source. Moreover, despite Dr. Jonas' "moderately limited" rating, he nonetheless concluded that Plaintiff was "able to meet the basic mental demands of competitive work on a sustained basis." (R. 200.) The Court notes that Dr. Jonas' conclusion (and his ratings of the individual functions) are in line with the

_____

15. The rating "moderately limited" refers to "when the evidence supports the conclusion that the individual's capacity to perform the activity is impaired." SSA - POMS § DI 24510.063 (Nov. 27, 1994), available at http://www.socialsecurity.gov/regulations/ (follow "Program Operations Manuel System" hyperlink). When the consultant has assessed a functional limitation of "moderately limited," the POMS directs the consultant to describe in narrative form the degree and extent of the capacity or limitation in Part III of the Mental RFC. Id. Thus, the mere fact that the consultant rated a function as "moderately limited" indicates only that some level of impairment was assessed. The adjudicator must look to the explanation given by the consultant in Part III to ascertain the actual degree and extent of the capacity or limitation. Here Dr. Jonas' narrative indicated no limitations on memory and understanding, and his agreement with Dr. Somen's opinion regarding personal and social adjustments and work related activities, which were "fairly consistent with the other evidence in [the] file." (R. 200.)

description of "competitive, remunerative, unskilled work" contained in S.S.R. 85-15.[16] Therefore, the Court concludes that the ALJ's hypothetical, which limits Plaintiff to light, unskilled work, accurately portrays the mental functional limitations resulting from Plaintiff's mental impairment. Accordingly, the Court finds that the hypothetical posed by the ALJ was not legally deficient.

## VI.   <u>CONCLUSION</u>

In light of the deferential standard of review in this social security appeal, the Court is constrained to find that the ALJ reasonably concluded that Plaintiff's asserted limitation as to concentration, persistence and pace did not accurately portray his mental impairment in light of all the relevant evidence, and therefore, the hypothetical posed by the ALJ was not legally deficient. Accordingly, the Court holds that the ALJ's decision of no disability based on the VE's testimony at Step 5 is supported by substantial evidence. Thus, Plaintiff's Motion for Summary Judgment will be denied, Defendant's Motion for Summary Judgment will be granted, and the decision of the Commissioner of Social Security to deny Plaintiff's application for benefits will be affirmed. An order consistent with this opinion follows.

---

16. <u>See</u> Note 13, <u>supra</u>.

## ORDER

**AND NOW,** this 2nd day of September, 2008, in consideration of the above motions for summary judgment and supporting briefs filed by both parties, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. No. 14) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 16) is **GRANTED**, and the decision of the Commissioner of Social Security to deny Plaintiff's application for benefits is **AFFIRMED**.

**IT IS FURTHER ORDERED** that Judgment be entered in favor of Defendant and against Plaintiff. The Clerk of Court shall mark this case closed.

By the Court:

_____
LISA PUPO LENIHAN
United States Magistrate Judge

cc:     All Counsel of Record